In The
# United States Court of Appeals
### For The Federal Circuit

## THE TURFGRASS GROUP, INC., and UNIVERSITY OF GEORGIA RESEARCH FOUNDATION, INC.,

*Plaintiffs – Appellants*,

**v.**

## CAROLINA FRESH FARMS, INC., CAROLINA FRESH FARMS, L.L.C., F/K/A Carolina Fresh Farms, Inc., and JOHN A. FOGLE, SR.,

*Defendants – Appellees.*

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA IN CASE NO. 5:10-cv-00849-JMC, JUDGE J. MICHELLE CHILDS.

_____

### BRIEF OF APPELLEES

_____

Robert F. Goings
GOINGS LAW FIRM, LLC
Post Office Box 436
Columbia, South Carolina 29202
(803) 350-9230
rgoings@goingslawfirm.com

*Counsel for Appellees*

Christian E. Boesl
COLLINS & LACY, P.C.
1330 Lady Street, 6th Floor
Columbia, South Carolina 29202
(803) 256-2660
cboesl@collinsandlacy.com

*Counsel for Appellees*

*Dated June 3, 2014*

THE LEX GROUP<sup>DC</sup> ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C. 20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

FORM 9.   Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

The Turfgrass Group, Inc.               v.   Carolina Fresh Farms, Inc.

No. 14-1017

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Carolina Fresh Farms, Inc.   certifies the following (use "None" if applicable; use extra sheets if necessary):

1.       The full name of every party or amicus represented by me is:

Carolina Fresh Farms, Inc. and Carolina Fresh Farms, LLC f/k/a Carolina Fresh Farms, Inc., and John A. Fogle, Sr.

2.       The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Carolina Fresh Farms, LLC

3.       All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4. ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Robert F. Goings - Goings Law Firm, LLC
Christian Boesl & Joel W. Collins, Jr - Collins & Lacy, P.C.

October 18, 2013                          /s Robert F. Goings
                Date                                Signature of counsel

                                          Robert F. Goings
                                             Printed name of counsel

Please Note: All questions must be answered
cc: _____

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES .......................................................................... iii

STATEMENT OF THE FACTS .................................................................... 1

SUMMARY OF ARGUMENT .................................................................... 11

ARGUMENT AND CITATIONS OF AUTHORITY ................................. 12

    1.    The District Court Properly Excluded the Surreptitious Recordings from Evidence at Trial ........................................... 12

        A.    In South Carolina, an Attorney's Agent is Prohibited from Surreptitiously Recording Another Party Without Consent ..................................................... 13

        B.    South Carolina Rules of Professional Conduct Apply to Pre-Litigation Conduct .................................... 19

        C.    The District Court's Remedy Was Proportional to the Violation .................................................................... 20

        D.    Georgia's Rules of Professional Conduct Do Not Apply ............................................................................. 23

        E.    Carolina Farms Did Not "Open the Door" at Trial to Evidence of the Surreptitious Recording ................... 24

    2.    The District Court Properly Excluded the Testimony of Plaintiffs' Damages Expert ...................................................... 25

    3.    The District Court Properly Granted Carolina Farms Partial Summary Judgment ...................................................... 30

        A.    Any Judicial Decisions Related to the Recovery of Actual Damages is Moot Because Plaintiffs failed to Prove Liability ........................................................... 30

B.    The District Court's Decision on Summary Judgment was Proper and any Later Clarification of that Decision Moots Plaintiffs' Argument that the Decision was Erroneous............................................ 30

4.    The District Court Properly Denied Plaintiffs' Motion for Directed Verdict ...................................................................... 34

A.    The District Court Properly Denied Directed Verdict on Plaintiffs' PVPA claim ................................. 34

B.    The District Court Properly Denied Directed Verdict on Plaintiffs' Lanham Act claim ...................... 37

5.    The District Court Did Not Limit the Jury's Consideration of a Reasonable Royalty Rate............................ 39

6.    The District Court Properly Refused to Instruct the Jury Regarding the Merger Clause .................................................. 41

CONCLUSION............................................................................................ 45

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Brown v. Apfel*,
  11 Fed. Appx. 58 (4th Cir. 2001) ........................................................ 34

*Brown v. McLean*,
  159 F.3d 898 (4th Cir. 1998) .............................................................. 12

*Bryant v. Aiken Reg'l Med. Ctrs., Inc.*,
  333 F.3d 536 (4th Cir. 2003) .............................................................. 34

*C&C Diesel Service, Inc. v. B & P Towing, Inc.*,
  911 F.2d 721 (4th Cir. 1990) .............................................................. 27

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ........................................................................... 26

*Doyle v. Estes Heating & Air Conditioning, Inc.*,
  326 S.E.2d 846 (Ga. Ct. App. 1985) .................................................. 42

*Fayetteville Investors v. Commercial Builders, Inc.*,
  936 F.2d 1462 (4th Cir. 1991) ............................................................ 31

*Finnigan Corp. v. United States Int'l Trade Comm'n*,
  180 F.3d 1354 (Fed. Cir. 1999) .......................................................... 23

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ........................................................................... 26

*George & Co., LLC, v. Imagination Entm't Ltd.*,
  575 F.3d 383 (4th Cir. 2009) .............................................................. 38

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
  243 F. Supp. 500 (S.D.N.Y. 1965) ..................................................... 28

*In re An Anonymous Member of the South Carolina Bar*,
   322 S.E.2d 667 (S.C. 1984)................................................................. 14

*In re Attorney General's Petition*,
   417 S.E.2d 526 (S.C. 1992)................................................................. 20

*In re Warner*,
   335 S.E.2d 90 (S.C. 1985)................................................................... 14

*Jennings v. Jennings*,
   401 S.C. 1 (S.C. 2012)........................................................................ 25

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ........................................................................... 27

*Lipton v. Nature Co.*,
   71 F.3d 464 (2d Cir. 1995) ................................................................. 37

*Midwest Motor Sports v. Arctic Cat Sales, Inc.*,
   347 F.3d 693 (8th Cir. 2003).................................................. 15, 16, 21, 22

*Nettles v. P&G Mfg. Co.*,
   33 Fed. Appx. 670 (4th Cir. 2002) ..................................................... 27

*Odetics, Inc. v. Storage Tech. Corp.*,
   185 F.3d 1259 (Fed. Cir. 1999) .......................................................... 12

*Oglesby v. General Motors Corp.*,
   190 F.3d 244 (4th Cir. 1999) ............................................................. 26

*Raylon, LLC v. Complus Data Innovations, Inc.*,
   700 F.3d 1361 (Fed. Cir. 2012) .................................................... 12, 20

*Reynolds v. Ingram*,
   C/A#: 5:98-CV-895-BO(2),
   2000 WL 33682680 (E.D.N.C. March 21, 2000).............................. 21

*RMS Tech., Inc. v. TDY Indus.*,
   64 Fed. Appx. 853 (4th Cir. 2003) ..................................................... 24

*The Turfgrass Group, Inc. v. Northeast Louisiana Turf Farms, LLC*,
    C/A 3:10-cv-01354-JTT-KLH (W.D. La. Nov. 20, 2013) ................. 17

*Tools USA & Equip. Co. v. Champ Frame Straightening Equip.*,
    87 F.3d 654 (4th Cir. 1996) ...................................................... 37

*Transclean Corp. v. Bridgewood Servs.*,
    290 F.3d 1364 (Fed. Cir. 2002) .............................................. 13

*Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*,
    29 F.3d 137 (4th Cir. 1994) .................................................... 26

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) .............................................. 28

*United States v. Alerre*,
    430 F.3d 681 (4th Cir. 2005) .................................................. 34

*United States v. Shaffer Equip. Co.*,
    11 F.3d 450 (4th Cir. 1993) .................................................... 20

*Univ. Patents, Inc. v. Kligman*,
    737 F. Supp. 325 (E.D. Pa. 1990) .......................................... 21

*Westchester Media v. PRL USA Holdings, Inc.*,
    214 F.3d 658 (5th Cir. 2000) .................................................. 39

## STATUTES

7 U.S.C. § 2541(b) ...................................................................... 35

7 U.S.C. § 2564 ..................................................................... 39, 40

7 U.S.C. § 3566 ........................................................................... 36

## RULES

ABA Model Rule 8.4(a) ................................................................ 16

ABA Model Rule 8.4(c) ................................................................ 15

Fed. R. Civ. P. 54(b) ...................................................................... 31

S.C. Loc. R. 83.I.08, RDE Rule IV DSC ................................ 13, 24

S.C. R. Prof'l. Cond. 5.3, cmt. 1, SCACR ................................... 14

S.C. R. Prof'l. Cond. 8.4(d) ................................................. 13, 14

## **OTHER AUTHORITIES**

S.C. Ethics Advisory Op. 08-13 (2008) ........................................ 15

S.C. Ethics Advisory Op. 91-14 (1991) ........................................ 14

S.C. Ethics Advisory Op. 92-17 (1991) ........................................ 15

## STATEMENT OF THE FACTS

Plaintiffs, The Turfgrass Group, Inc. ("Turfgrass Group") and University of Georgia Research Foundation ("UGARF") (collectively "Plaintiffs"), asserted three causes of action against Carolina Fresh Farms, LLC ("Carolina Farms"): (1) violations of the Plant Variety Protection Act ("PVPA"), (2) violations of the Lanham Act, and (3) breach of a sublicense agreement ("Sublicense Agreement") related to the sale of a protected variety of centipede turfgrass. [Doc. 1]. Carolina Farms denied these allegations. [App. p. 97]. A jury found in favor of Carolina Farms on all three causes of action. [App. p. 3].

In May 1997, the Turfgrass Group acquired the sod and seed production rights to a certified variety of centipede grass developed by the UGARF, referred to as "TifBlair." [Doc. 1-4]. The Turfgrass Group is a joint venture between the owners of two large sod farms in Georgia. [App. pp. 1169, 1713].

In 2001, the Turfgrass Group presented Carolina Farms with the opportunity to become a licensed producer of TifBlair. Carolina Farms is a family-owned farm located in Neeses, South Carolina. The sales manager of the Turfgrass Group, Charlie Jones, represented to Carolina Farms that its largest sod competitor, Super Sod, a division of Patten Seed Company

("Super Sod") would not receive a license to sell TifBlair in South Carolina. [App. pp. 1223-1225]. On February 28, 2001, Carolina Farms entered into the Sublicense Agreement with the Turfgrass Group to grow and sell TifBlair centipede. [App. p. 1893]. The Turfgrass Group drafted the Sublicense Agreement. [App. pp. 1121-1122]. During the time Carolina Farms maintained the TifBlair contract, Carolina Farms produced and sold both common centipede and TifBlair certified centipede. [App. pp. 1292, 1714]. Carolina Farms would invest hundreds of thousands of dollars marketing TifBlair and establishing the TifBlair brand throughout South Carolina. [App. pp. 1039-1041, 2012].

In 2005, the Turfgrass Group licensed Super Sod to grow and sell TifBlair in South Carolina. [App. pp. 1115, 1225]. The Turfgrass Group also entered into a $5.3 million dollar transaction to assign all seed production rights of TifBlair to Super Sod. [App. pp. 1115, 1657, 1989, 378-380, 411]. Super Sod took ownership of the TifBlair website. [App. pp.1167, 1172]. At trial, Carolina Farms established that the principals of Turfgrass Group and Super Sod have a close personal and business relationship, owning other businesses and other certified grasses together. [App. pp. 1710-1713].

After Super Sod became a producer of TifBlair, the Turfgrass Group and Super Sod worked together to terminate the Sublicense Agreement with Carolina Farms in order to eliminate the competition for Super Sod. The Turfgrass Group and Super Sod devised a scheme to terminate Carolina Farms' Sublicense Agreement in a manner that would prevent Carolina Farms from curing any alleged breach. With the knowledge of the Turfgrass Group, a Super Sod employee known as "Booster" contacted Clemson University, the state's crop certifying agency in June 2006 to "tip off" the University that Carolina Farms' TifBlair fields should not pass certification based on the presence of weeds. [App. pp. 739, 950, 1235-1236, 1242]. The Turfgrass Group knew of possible certification issues but continued to accept TifBlair royalty payments from Carolina Farms. [App. pp. 1100-1116, 1932-1965]. However, the Turfgrass Group intentionally waited until late in the Fall of 2006 when the fields were dormant to notify Carolina Farms that it breached the Sublicense Agreement. [App. pp. 1903-1904]. The Turfgrass Group was required to provide Carolina Farms with a thirty-day period to cure any breach before the agreement could be terminated for cause. [App. pp. 1064, 1132- 1134, 1899 ¶ 12.2].

Importantly, however, the Turfgrass Group knew that it was impossible for Carolina Farms to cure this alleged breach in November and

December of 2006. A breach based on fields failing certification can only be cured during the growing season, not the Fall or Winter months when the grass is dormant. [App. pp. 740, 1134-1137, 1240-1241, 1534-1535, 1858, 1905]. Carolina Farms was unable to bring the fields back into certification. Based on this, the Turfgrass Group and Super Sod were successful in terminating the Sublicense Agreement for cause, claiming that Carolina Farms failed to maintain production fields consistent with certification and production protocols. [App. pp. 1903-1904].

Prior to Super Sod's involvement with TifBlair, the Turfgrass Group *never* complained if the production fields failed certification. Instead the Turffgrass Group willingly accepted royalty payments from Carolina Farms each month for many years even if production fields failed certification. [App. pp. 1100-1116, 1932-1965, 2015]. The Turfgrass Group never enforced other provisions in the Sublicense Agreement related to certification and the quality assurance of TifBlair production. [App. pp. 1895-1896 ¶ 4]. The Turfgrass Group never enforced provisions in the Sublicense Agreement related to PVPA notices and other markings in the advertisement and sales of TifBlair. [App. pp. 1491-1492, 1895-1896 ¶ 4]. Additionally, these provisions were never enforced against other TifBlair sublicensees. [App. pp. 1704- 1709, 1906].

After the termination of the Sublicense Agreement, Carolina Farms ceased producing and selling TifBlair but continued to sell common centipede. [App. pp. 1502-1503, 1510-1511, 1558, 420-421]. At termination, Carolina Farms had only 65 acres of harvestable *uncertified* grass planted from TifBlair seed in production. [App. pp. 1406, 1535]. These uncertified fields of TifBlair were harvested and sold as common centipede grass. [App. pp. 1406, 428-433, 435-441, 442-443].

The Sublicense Agreement expressly allowed Carolina Farms to sell existing inventory post-termination without designating the grass as TifBlair. [App. pp. 1147, 1899-1900 ¶ 12.3] ("In the event this Agreement is terminated for reason 12.1(c) [failure to keep fields certified], Sublicensee may sell existing inventory only into the generic trade *as variety not stated* and all Sublicense product material must be destroyed and certified by Sublicensor within one year of termination.") (emphasis added). The meaning of "variety not stated" was disputed at trial, although substantial evidence suggested that this term meant the grass could be sold as anything other than "TifBlair." [App. pp. 781-790, 864, 1069-1071, 1144, 1147, 1636-1638, 1907-1922, 1923-1930]. The Turfgrass Group even admitted, "[Carolina Farms is] allowed to sell it as generic Centipede grass to clean out their fields." [App. pp. 402-403]. The Sublicense Agreement never

prohibited Carolina Farms from marketing the grass through another name. [App. pp. 1893-1902, 1714-1715].

Following the termination, Carolina Farms did not pay the Turfgrass Group royalties from grass sold from these uncertified fields. [App. pp. 1276, 1639]. The Sublicense Agreement only required royalties for the sale of *certified sod sold as TifBlair.* [App. p. 1893 ¶ 1.1 "'Sublicensed Product' means 'certified sod;'" ¶ 1.3 "'Sublicensed Sod' means sod production from Certified Seed under cultivation conditions which meet the specifications of the official crop certifying agency of the state in which said sod was grown;" ¶ 5.3 "Sublicensee agrees to pay a royalty on all sales of Sublicensed Product of seven (7) percent of the sales amount."].

The reason that royalties were only required from certified fields was because the Sublicense Agreement defines "Sublicensed Product" as grass sold from a certified field. Despite this language, the Turfgrass Group claimed that Carolina Farms was required to pay royalties on grass from the uncertified fields sold after the termination. [App. pp. 1117-1121, 1639-1640]. The substantial evidence at trial supported the conclusion that the Turfgrass Group could not obtain royalties from the uncertified grass. [App. pp. 1140-1147, 1276, 1639].

For a limited period of time after the termination, Carolina Farms marketed some of its common centipede under the name of "Carolina Green" centipede.  [App. pp. 1502-1503, 1407].   The phrase "Carolina Green" did not resemble, sound or look like the name "TifBlair."  [App. pp. 738, 764-765, 1157-1160].   In the sod industry, it is customary for sod farmers to sell common varieties of grass under a trade name.  Carolina Farms referred to its common blue fescue as "Carolina Blue."  [App. p. 1335].   Other sod farmers have given trade names to their non-certified common centipede varieties, known throughout the industry as "Hammock" centipede, "Santee" centipede, "Covington" centipede, "Emerald Ice" centipede, and "TifBlair Ecograss" centipede.  [App. pp. 903-906, 1161-1165, 1610-1611, 1720-1723].

Carolina Farms did not infringe on the rights of TifBlair by referring to its centipede as "Carolina Green," and nothing in the Sublicense Agreement precluded this type of marketing.  Plaintiffs admitted there was "nothing wrong" with Carolina Farms marketing their common centipede as Carolina Green.  [App. pp. 1718-1720, 385-386, 415].   Carolina Farms testified that the centipede grass it grew was cold tolerant, winter hardy, and drought resistant for the areas to which it sold in South Carolina.  [App. pp. 1410, 1428, 1468, 1487, 1503, 1511].  The developer of TifBlair, Dr. Wayne

Hanna of UGARF, testified that common centipede was no more winter hardy or drought resistant than TifBlair for the climates in South Carolina. [App. pp. 878-887, 892]. Furthermore, the Plaintiffs admitted that they do not own rights to descriptive words that Carolina Farms used to advertise it centipede such as "winter hardy," "drought resistant," or "new centipede." [App. pp. 774-775, 876, 1159-1160].

Plaintiffs alleged that Carolina Farms did not destroy the fields of uncertified TifBlair grass. [Doc. 1, ¶ 21-22]. Plaintiffs admitted the only way that Carolina Farms could be liable is if Carolina Farms failed to destroy the fields planted in TifBlair. [App. pp. 398-399]. The evidence at trial revealed that Carolina Farms sold the 65 acres of harvestable uncertified grass without designating the grass as TifBlair, and Carolina Farms destroyed the other fields planted in TifBlair that were not yet harvestable.

Mr. Andy Fogle of Carolina Farms testified the TifBlair fields were destroyed by methyl bromide gas fumigation and spraying herbicides. [App. pp. 906-907, 1534, 1537-1539, 1558, 1723; 1966-1972, 1985-1988]. To support this testimony, Carolina Farms introduced an invoice for the methyl bromide gas in the amount of $75,900.00. [App. pp. 1985-1988]. Carolina Farms also introduced invoices showing that 275 gallons of glyphosate non-selective herbicide was purchased for the fields. [App. pp. 906, 1536-1537,

1966-1972]. Then, Carolina Farms purchased over $80,000.00 in new common centipede seed for replanting. [App. pp. 1542-1546, 1973-1984, 1989-2006]. The Turfgrass Group presented no evidence to the contrary. [App. p. 1724]. The fields were rotated out of TifBlair and into other crops. [App. pp. 2062-2063]. The overwhelming evidence proved that Carolina Farms destroyed the fields formerly planted in TifBlair, and Plaintiffs admittedly presented no evidence to the contrary. [App. p. 1724].

Following the termination of the Sublicense Agreement, Plaintiffs allegedly heard rumors that Carolina Farms was continuing to sell TifBlair centipede without a license. [App. pp. 1628, 938]. Plaintiffs hired an attorney from Arkansas, C. Duff Nolan of The Nolan Law Group, PLLC. Attorney Nolan directed staff members from his office, Zelotis Wofford and Billy Self, to conduct an "investigation" of Carolina Farms. This investigation was to manufacture evidence to support a lawsuit. Starting on September 28, 2007, and continuing into 2009, Attorney Nolan's staff secretly and deceitfully recorded conversations with individuals of Carolina Farms. [App. pp. 105-121]. They entrapped Carolina Farms' store employees through clever devices, tricks, and lies to manufacture evidence that otherwise would not exist to support a lawsuit. Throughout the course of their "investigation," Attorney Nolan's agents cajoled and badgered store

employees to take actions outside the normal course of business in order to incite and induce a purported violation of the law. When Attorney Nolan's agents did not receive the answers they wanted, they created new lies and persisted in deceitful tactics with the goal of coercing Carolina Farms' employees. [App. pp. 105-116].

Because it is unlawful in South Carolina for an attorney to cause surreptitious recordings through its agents, the District Court excluded any evidence of the surreptitious recordings or any evidence gleaned therefrom. However, the District Court allowed Plaintiffs to present evidence of any unrecorded communications or samples of grass purchased from Carolina Farms.

At trial, Plaintiffs called Zelotis Wofford to testify about his unrecorded communications with Carolina Farms during his investigation. Zelotis Wofford testified that a Carolina Farms store employee told him that Carolina Green had the same characteristics as TifBlair, but that Carolina Farms was no longer selling TifBlair. [App. pp. 974, 993-994]. The substance of the unrecorded conversations was largely cumulative of the inadmissible recorded conversations. The testimony from Carolina Farms was that after the termination of the Sublicense Agreement, TifBlair was only purchased for sale through a licensed grower in South Carolina, Green

Acre Turf Farm. [App. pp. 1405-1406, 1491-1494]. Further, despite Plaintiffs' claim that Carolina Farms was improperly selling TifBlair, Plaintiffs' examination of the grass purchased by the investigator only revealed that the grass was common centipede, not TifBlair. [App. pp. 1745-1749].

After the evidence was presented at trial, the jury found that Carolina Farms did not violate the PVPA or the Lanham Act, and did not breach the Sublicense Agreement.

## SUMMARY OF ARGUMENT

The Plaintiffs have raised a plethora of issues on appeal, challenging the District Court's evidentiary rulings, interlocutory orders, and decisions to deny directed verdict. Other than this Court having exclusive jurisdiction from a final order related to the PVPA, this appeal does not concern unique issues of patent or trademark law. This appeal should be decided by applying the laws of South Carolina and the Fourth Circuit.

The Plaintiffs are requesting this Court to reverse a District Court's ruling on procedural issues by ignoring the deferential abuse of discretion standard. The District Court properly excluded recorded conversation of Carolina Farms that were unethically obtained by Plaintiff's counsel and properly acted as a gatekeeper in precluding testimony of Plaintiff's expert.

Further, the Plaintiffs are requesting this Court to overturn a jury verdict where the record contains conflicting and disputed evidence on each cause of action. The District Court should be affirmed.

## ARGUMENT AND CITATIONS OF AUTHORITY

### 1. The District Court Properly Excluded the Surreptitious Recordings from Evidence at Trial.

The District Court exercised sound discretion in prohibiting Plaintiffs from introducing surreptitious recordings obtained from Plaintiffs' attorney's private investigators because the recordings violated the South Carolina Rules of Professional Conduct.

The Federal Circuit applies regional circuit law to Rule 11 motions and motions for sanctions regarding the inherent powers of the courts. *See Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1367 (Fed. Cir. 2012). The standard of review is an abuse of discretion. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1276 (Fed. Cir. 1999) (citing *Brown v. McLean*, 159 F.3d 898, 904 (4th Cir. 1998)). "Even if in error, the exclusion of evidence is not cause for reversal unless the exclusion of the evidence affected the 'substantial rights of the parties.'" *Id.*

The District Court did not apply an erroneous view of the law or a clearly erroneous assessment of the evidence. In any event, the exclusion of

this evidence did not affect a substantial right of the Plaintiff to warrant reversal.

This Court has expressed extreme reluctance to overturn an order sanctioning a party or its attorney. *See Transclean Corp. v. Bridgewood Servs.*, 290 F.3d 1364, 1374 (Fed. Cir. 2002) ("To hold that the district court abused its discretion would be to disarm the court of its important power to police its proceedings to ensure transparency and predictability and to discourage mischievous conduct by litigants. It will be a rare case in which we take such an action.").

## A. In South Carolina, an Attorney's Agent is Prohibited from Surreptitiously Recording Another Party Without Consent.

Attorneys practicing before the District Court of South Carolina are subject to the South Carolina Rules of Professional Conduct and South Carolina law interpreting these rules. *See* Local Civil Rule 83.I.08, RDE Rule IV DSC. The South Carolina Rules of Professional Conduct strictly prohibit surreptitious recording caused by or at the direction of attorneys.

Rule 8.4(d) of the South Carolina Rules of Professional Conduct prohibits an attorney from engaging "in conduct involving dishonesty, fraud, deceit or misrepresentation" or to "assist or induce another to do so, or do so through the acts of another." An attorney is also responsible for actions of persons "employed or retained by or associated with a lawyer," which

includes investigators, whether as employees or independent contractors. *See* Rule 5.3, cmt. 1, SCACR. ("Lawyers generally employ assistants in their practice, including….investigators. Such assistants, whether employees or independent contractors, act for the lawyer in rendition of the lawyer's professional services.").

In South Carolina, a violation of Rule 8.4(d) occurs when a lawyer *or his agent* engages in the surreptitious recording of another party without that party's knowledge and consent. The South Carolina Supreme Court has held that "an attorney is guilty of misconduct . . . where a recording is made of a conversation with an adversary or potential adversary without the knowledge and consent of all parties to the conversation." *In re: An Anonymous Member of the South Carolina Bar*, 322 S.E.2d 667, 669 (S.C. 1984). The South Carolina Supreme Court cautions that it is "reprehensible and impermissible for an attorney to secretly record another attorney or, indeed, another person." *In re Warner*, 335 S.E.2d 90, 91 (S.C. 1985). The South Carolina Bar Ethics Advisory Committee instructs that "no attorney should record, cause to be recorded, counsel a client to record or assist a client to record any conversation without the consent or prior knowledge of all parties to the conversation." S.C. Ethics Advisory Op. 91-14 (1991). It is "abundantly clear . . . an attorney [] may never surreptitiously record a

conversation with another person, regardless of the reason for the recording." S.C. Ethics Advisory Op. 92-17 (1991); *see also* Op. 08-13 (2008). This prohibition is not limited merely to litigation, but every facet of the legal practice.

The Eighth Circuit Court of Appeals has squarely addressed the issue presented in the case at bar. In *Midwest Motor Sports v. Arctic Cat Sales, Inc.*, 347 F.3d 693, 697 (8th Cir. 2003), attorneys for the plaintiff engaged a private investigator to visit the opposing parties' place of business and to secretly record conversations with employees. *Id.* at 695. The district court found that the surreptitious recording of another party violated ABA Model Rule 8.4(c). As a sanction, the corut excluded from evidence all recordings and "any evidence gleaned from those recordings." *Id.* at 697-99. The court found "*this type of conduct involved deceit or misrepresentation and an attorney has a duty to refrain from the type of surreptitious recording that occurred in this case*." *Id.* (emphasis added).

On appeal, the court of appeals upheld the district court's exclusion of the recordings from evidence as a sanction for the attorney's violation of the Rules of Professional Conduct. *Id.* at 701. The appellate court noted the information surreptitiously obtained by plaintiff's counsel "could have been obtained properly through the use of formal discovery techniques." *Id.* at

699.  On appeal, the attorneys argued they could not be held responsible for the actions of a third party.  *Id.* at 698.  Relying on ABA Model Rule 8.4(a), the Eighth Circuit rejected that argument stating, *"Lawyers cannot escape responsibility of the wrongdoing they supervise by asserting that it was their agents, not themselves, who committed the wrong." Id.* (emphasis added).

In this case, Attorney Nolan informed the District Court he intended to use the recordings obtained by Wofford as evidence at trial when he filed suit.  [App. p. 132].  However, Plaintiffs argue "none of the recordings in the instant case were made by an attorney or at the express instruction of an attorney."  [App. Brief, p. 24].  The evidence clearly shows otherwise. Attorney Nolan and Wofford admitted that the investigation was undertaken at the request of Attorney Nolan.  [App. pp. 965, 969, 975-996, 128-136]. Based on the employment agreement, Wofford agreed to "work *exclusively* for Nolan Law Group, PLLC, f/k/a/ Nolan Law Group."  The employment agreement contemplated that recordings would be made and the Nolan Law Group would transcribe the recorded conversations.  [App. pp. 124-125]. The investigative forms provided by Attorney Nolan to Wofford contained a section to affirm that the conversation was recorded.  [App. pp. 128-136; App. p. 1931].  During trial, Wofford testified regarding the nature of his relationship with Nolan, admitting that he had worked exclusively for Nolan

for the past twelve years and was paid on an hourly basis by Nolan. [App. p. 975]. Wofford's picture is displayed on the homepage of Attorney Nolan's website. [App. pp. 978-979].

When questioned by the Court, Attorney Nolan admitted Wofford had recorded conversations for him in the past, and he knew there was a possibility that Wofford would record his conversations with Carolina Farms. [App. pp. 128-129]. Attorney Nolan also conceded that Wofford was working on his behalf at the time he made the recordings, despite his position that Wofford was an "independent contractor"[1]:

> THE COURT: Is it your position that an investigator working for you can't, acting on your behalf, violate the ethical rules in South Carolina?
>
> MR. NOLAN: Your Honor, he's an independent contractor.
>
> THE COURT: He is working for you, correct? You asked him to go out and investigate this on your behalf so that you could respond to your client, correct?
>
> MR. NOLAN: That is correct, Your Honor.

---

[1] However, in litigation pending in the District Court of Louisiana, Attorney Nolan took an opposite position, claiming that Wofford was his "employee." The Louisiana court admonished Nolan for acting in bad faith and for a lack of candor to the tribunal for arguing that Wofford was an employee in Louisiana but an independent contractor in South Carolina. *See The Turfgrass Group, Inc. v. Northeast Louisiana Turf Farms, LLC*, C/A 3:10-cv-01354-JTT-KLH, 2013 U.S. Dist. LEXIS 166570 (W.D. La. Nov. 20, 2013) (available on PACER as Doc. 75).

[App. pp. 133-134].   The evidence demonstrates Wofford was acting as Nolan's agent at the time the recordings were made.  Nolan took the position that Wofford was an "independent contactor."

During the hearing on Defendants' Motion for Sanctions, Plaintiffs' counsel agreed with the District Court that the use of the recordings was not allowed, given the plain language of the Local Rules.  Nolan agreed with the Court that he was no longer seeking to use the recordings, as the South Carolina Rules of Professional Conduct and the Local Rules undoubtedly deemed the conduct unethical.

> THE COURT: You were planning to use those taped conversations to file your lawsuit, correct, knowing that those taped conversations don't comply with the South Carolina rules?
>
> MR. NOLAN: Actually, I didn't know they didn't comply with the South Carolina rules at the time.
>
> THE COURT: Now you do. I mean, you've read the local rule.
>
> MR. NOLAN: Yes, ma'am.
>
> THE COURT: So you still intend to use these conversations in your case?
>
> MR. NOLAN: *It doesn't sound like it. No.*
> ….
> MR. NOLAN: *Yes. I agree with your reading of the rule, Your Honor.  I do.*

[App. pp. 135-136].

18

Given the overwhelming evidence that the private investigators who recorded these conversations were Nolan's agents, the clear language of the rules themselves, and *counsel's own admission* that he was no longer seeking to use the recordings as evidence, the District Court did not abuse its discretion in finding that Plaintiffs' counsel violated South Carolina ethical laws and in properly excluding the evidence at trial.

### B. South Carolina Rules of Professional Conduct Apply to Pre-Litigation Conduct.

Plaintiffs argue these surreptitious recordings fall outside the scope of the South Carolina Rules of Professional Conduct because these secret recordings were made prior to the commencement of litigation. This position is erroneous and undermines the purpose of the rules governing attorney conduct.

The Rules do not carve out a "pre-litigation" exception. The prohibition is applicable to all attorneys, at all times, whether litigation is anticipated or pending. The South Carolina Supreme Court has never carved out a "pre-litigation" exception to this strict requirement. The only exception to South Carolina's long-standing rule that attorneys and their agents are barred from the surreptitious recording of another party is if the recording was conducted with "the prior consent or, at the request of, an appropriate law enforcement agency in the course of a legitimate criminal

investigation." *In re Attorney General's Petition*, 417 S.E.2d 526, 527 (S.C. 1992). This law enforcement exception does not apply here. Plaintiffs' attempt to carve out a "pre-litigation" exception to the Rules of Professional Conduct undermines the letter and spirit of the rules.

### C.   The District Court's Remedy Was Proportional to the Violation.

The remedy issued by the District Court to exclude the improperly obtained evidence from use at trial was proper given the egregious nature of the conduct. Determining what sanctions, if any, to impose is initially a matter within the discretion of the district court. *Raylon, LLC*, 700 F.3d at 1370. Pursuant to Rule 11 and the inherent power of the court, the District Court was allowed to impose sanctions against the Plaintiffs for their abuse of the judicial system. *See U.S. v. Shaffer Equip. Co.*, 11 F.3d 450 (4th Cir. 1993). Carolina Farms requested the District Court consider dismissing the case, striking the pleadings, revoking Attorney Nolan's *pro hac vice* admission status, assessing attorney's fees, or at the very least, excluding any evidence that was improperly obtained. [App. pp. 118-120, 127].

After applying applicable law, the District Court denied Carolina Farms' request to dismiss the case, strike the pleadings, revoke Attorney Nolan's *pro hac vice* admission status, or assess attorney's fees. Instead, the District Court fashioned a remedy that prohibited Plaintiffs from introducing

into evidence the surreptitious recordings and any evidence gleaned therefrom. The District Court allowed the investigators to testify about any unrecorded conversations and any testing of the grass purchased from the undercover buys. [App. p. 137]. Plaintiffs were not prohibited from using formal discovery to prove their allegations. The District Court's holding imposed the least extreme and most appropriate sanction under the circumstances.

This sanction was consistent with the holdings of other courts that excluded evidence that was unethically obtained by attorneys or their agents. *See Midwest Motor Sports v. Arctic Cat Sales, Inc.*, 347 F.3d 693 (8th Cir. 2003) (excluding secret records conducted by an attorney's investigator); *Univ. Patents, Inc. v. Kligman*, 737 F. Supp. 325, 329 (E.D. Pa. 1990) ("the court is satisfied that the circumstances warrant precluding the defendants from introducing any information obtained through [unethical contacts]."; *Reynolds v. Ingram*, C/A#: 5:98-CV-895-BO(2), 2000 WL 33682680 (E.D.N.C. March 21, 2000) ("When an attorney representing a party in a matter before this Court violates ethical rules, this Court may fashion appropriate sanctions, including excluding any evidence improperly obtained.").

Plaintiffs claim the actions of the District Court "neutered" their case. But the District Court's order only prohibited the use of the unethical recordings obtained by Attorney Nolan's investigators. All other evidence in Plaintiffs' possession, including evidence of conversations the investigators had with Carolina Farms' employees that were not surreptitiously recorded, could be presented to the trier of fact. The District Court held that "[O]ther evidence that has been obtained as a result of Plaintiffs' investigation, including, for example, samples of grass that the Defendants' employees sold investigators or things of that nature would be allowed." [App. p. 137].

As the Eighth Circuit Court of Appeals noted in *Midwest Motor Sports* the information obtained by plaintiff's counsel "could have been obtained properly through the use of formal discovery techniques." *Midwest Motor Sports*, 347 F.3d at 699. In the same vein, Plaintiffs had the opportunity through formal discovery to ethically and properly obtain evidence related to the allegations. The Plaintiffs' substantial rights were not affected because they had the opportunity for full discovery allowed under the rules. Plaintiffs failed to prove the exclusion of these recordings violated their substantive rights.

Further, at trial, Wofford was allowed to testified regarding the *unrecorded* conversations with Carolina Farms' employees and his

knowledge regarding testing of the grass. Plaintiffs argued at trial that Carolina Farms' employees admitted to the alleged acts of infringement in these unrecorded conversations. [App. p. 1771]. Because Wofford testified that Carolina Farms' employees admitted in unrecorded conversations that Carolina Green was TifBlair, the introduction of the recorded conversations would be cumulative in nature. Accordingly, the District Court properly prevented Plaintiffs from polluting the trial with evidence that was improperly and deceitfully obtained.

### D. Georgia's Rules of Professional Conduct Do Not Apply.

Plaintiffs attempt to persuade this Court that the District Court should have applied Georgia law in determining whether to exclude the tape recordings. Plaintiffs argue for the first time that Georgia law should apply based on a choice of law provision contained in the Sublicense Agreement executed by the parties. As a general rule, this Court will not consider an argument for the first time on appeal. *See Finnigan Corp. v. United States Int'l Trade Comm'n*, 180 F.3d 1354, 1363 (Fed. Cir. 1999) (rejecting an argument represented for the first time on appeal). Thus, this argument should be summarily denied.

Even if Plaintiffs' argument was preserved, this newly-raised argument fails on the merits. First, this choice of law provision governs the

substantive law to apply to the contractual relationship of the parties, not the procedural law of the forum state. *See RMS Tech., Inc. v. TDY Indus.*, 64 Fed. Appx. 853, 857 (4th Cir. 2003) (holding that the procedural law of the forum state applies). Plaintiffs fail to highlight any provision within the Sublicense Agreement that specifies which states law shall govern the professional conduct of their attorneys. In the District Court, the South Carolina Rules of Professional Conduct expressly govern. *See* Local Civil Rule 83.I.08, RDE Rule IV DSC. The Rules of Professional Conduct of Georgia have no applicability.

### E. Carolina Farms Did Not "Open the Door" at Trial to Evidence of the Surreptitious Recording.

Plaintiffs assert the District Court erred in excluding the undercover tape recordings, arguing that Carolina Farms "opened the door" to the recorded conversations during trial. [App. Brief, p. 49]. Plaintiffs argue that Defendant opened the door to the admissibility of excluded evidence by cross-examining a witness about testing the grass Wofford purchased. This argument is without merit. The testing of the grass does not concern the recording. In sanctioning the Plaintiffs, the District Court specifically allowed the admissibility of evidence related to samples or testing of the grass purchased from the undercover buys, but not the recording. Carolina Farms followed the District Court's ruling in questioning Plaintiffs about

any samples of grass purchases. Carolina Farms never opened the door about recorded conversation of those purchases. The District Court correctly found that Carolina Farms did not open the door to the admissibility of the recorded conversations. [App. pp. 1759-1760, 1766].

## 2. The District Court Properly Excluded the Testimony of Plaintiffs' Damages Expert.

Plaintiffs contend the District Court erred in not allowing their damages expert, Donald Davis, to testify at trial. As a threshold matter, the exclusion of Plaintiffs' damages expert does not warrant reversal because the jury found that Carolina Farms did not infringe on *TifBlair* or breach the Sublicense Agreement. [App. pp. 3-5]. Because the jury found Carolina Farms was not liable for any of the alleged wrongful acts, the admissibility of Mr. Davis' opinion for damages is without consequence. It is axiomatic that liability must be proven first. As South Carolina courts aptly say, "whatever doesn't make any difference, doesn't matter." *Jennings v. Jennings*, 401 S.C. 1, 6, 736 S.E.2d 242, 244 (S.C. 2012). For this reason, this issue on appeal should be rejected.

Notwithstanding this fact, the District Court's decision to exclude Davis' testimony was within its sound discretion. The District court found Davis to be a qualified expert witness, but it determined his opinions were unreliable. Davis rendered an opinion that Plaintiffs were entitled to

damages measured at a royalty rate equal to fifty-three percent (53%) of the retail price of the TifBlair grass, for total lost royalties amounting to $2,486,125.35. Davis created a royalty rate 657.143% to 1,225% higher than the established royalty rate ranging from 4% to 7%. [App. p. 141].

Trial judges act as gatekeepers to ensure that any and all expert testimony is both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The trial judge's role is to ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. In this regard, "[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and not supported by the record." *See Tyger Constr. Co. Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (holding that, even if an expert is properly qualified, "a court may exclude testimony [that] is not sufficiently reliable because of invalid assumptions or lack of inquiry into the relevant facts"). "If the Court concludes that there is simply too great an analytical gap between the data and the opinion proffered," or that the expert testimony is purely speculative or conjectural, the expert testimony must be excluded. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Appellate courts grant broad deference to a district court over the admissibility of expert testimony given the United State Supreme Court's admonition that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Nettles v. P&G Mfg. Co.*, 33 Fed. Appx. 670, 671 (4th Cir. 2002) (citing *Kumho Tire Co.*, 526 U.S. at 147). "Only in cases where the evidence was essential, or the exclusion resulted in fundamental prejudice, have courts reversed such orders." *C&C Diesel Service, Inc. v. B & P Towing, Inc.*, 911 F.2d 721, 722 (4th Cir. 1990).

Assuming arguendo that Plaintiffs successfully proved infringement, the District Court's exclusion of Davis' testimony would still be proper. The District Court found his opinion to be speculative in nature and based on conjecture. "The record reflects that Davis' opinion is not based on accepted methodology, has not been subjected to peer review or publication, and has not been generally accepted within the relevant scientific community." [App. p. 19]. The District Court's conclusion was proper for several reasons. First, Davis admitted his theory was a "novel concept" and his opinion was "very subjective." [App. pp. 208, 247]. Davis was unaware of any expert or person in his profession that "subscribe[d] to the concept in which [he] espoused in this case." [Id. p. 209]. He conceded that no court

has accepted his theory in the calculation of reasonable royalty rates. [Id. pp. 209-210]. Made-up, subjective, and novel concepts from proffered experts are inadmissible.

Second, the District Court properly excluded Davis' testimony because he improperly created an "extra factor" to apply in addition to the factors established in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 243 F. Supp. 500 (S.D.N.Y. 1965). Davis referred to this factor as an "additional royalty" to disgorge Carolina Farms of all profits. [App. pp. 158, 283]. Davis admitted this additional factor was a "novel" concept and a "subjective opinion of [his], that had not been adopted by other experts in the field in calculating a reasonable royalty rate." [Id.]. As the District Court noted, "Davis acknowledged that the addition of this factor had no basis in established authority or methodology and was merely his subjective opinion." [App. pp. 18, 155-158].

Third, this "extra factor" that Davis proposed to calculate lost profits were based on a hypothetical study of Louisiana State University for a fictitious startup centipede sod farm. Davis did not tie the basis of his opinions with the facts of the case. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312-19 (Fed. Cir. 2011) (finding the "25 percent rule of thumb" opinion of an expert is a fundamentally flawed tool for determining

a baseline royalty rate based on the expert's failure to tie his opinions to the facts of the case."). Davis blindly accepted these assumptions used for illustrative purposes in the study as true to Carolina Farms. In using this study, Davis failed to analyze Carolina Farms' profitability for either TifBlair or common centipede, failed to perform any market analyses, and did not review any records or data related to Carolina Farms' business operations. [App. pp. 147-151, 699-700].

Davis' opinions also lack a reliable economic relationship to the facts of this case. The District Court correctly found that Davis blindly applied the assumptions of fact used in the study without "includ[ing] any adjustments for relevant economic circumstances." [App. p. 18]. Davis' testimony established that "he had not reviewed any data concerning Carolina [Farms'] operations and had not accounted for any economic circumstances relevant to centipede sod and production and sales during the years in which he calculated his projections." [App. pp. 18-19]. Based on these deficiencies, the District Court soundly reasoned that Davis' opinion had "little or no basis in the actual facts of this case," and was so flawed as to "provide little help to the trier of fact." [Id.]. The District Court did not abuse its discretion. For all of these reasons, the District Court properly excluded Davis' testimony.

### 3. The District Court Properly Granted Carolina Farms Partial Summary Judgment.

#### A. Any Judicial Decisions Related to the Recovery of Actual Damages is Moot Because Plaintiffs Failed to Prove Liability.

The Plaintiffs' appeal of the District Court's interlocutory summary judgment orders relate to the issue of damages. The jury did not find Carolina Farms infringed upon or committed wrongdoing of any nature against Plaintiffs. Therefore, an appeal on questions related to damages is of no consequence as the jury never considered the issue of damages in reaching its decision. Without proving liability, any appeal on the issue of damages is misplaced.

#### B. The District Court's Decision on Summary Judgment was Proper and any Later Clarification of that Decision Moots Plaintiffs' Argument that the Decision was Erroneous.

On cross-motions for summary judgment, the District Court denied summary judgment as to liability on all causes of action but granted summary judgment in part as to Plaintiffs' claims for *actual damages* under the PVPA and Lanham Act. In reaching this decision, the District Court found that "aside from their reliance on their expert witness, Plaintiffs have presented the court with no evidence to establish actual damages under the PVPA or the Lanham Act." [App. p. 27]. The District Court correctly found that Plaintiffs' 30(b)(6) representative, Kenneth Morrow, failed to

provide any calculation for the amount of damages Plaintiffs allegedly sustained as a result of Defendants' purported infringement.  [*Id.* p. 7].  At the summary judgment stage, Plaintiffs offered no affidavit, deposition testimony, or competent evidence as to damages, except for the excluded expert opinion of Davis.  [App. pp. 666-669, 695-696, 676-688].  In fact, Plaintiffs never responded to the arguments on summary judgment related to the lack of actual damages.  [App. pp. 676-688].  On appeal, Plaintiffs offer no argument that it presented the lower court with any evidence of damages at summary judgment.

Despite this proper finding, the District Court subsequently clarified its decision by allowing Plaintiffs to present evidence of damages in considering evidentiary motions before trial.  [Doc. 198]. *See Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991) (finding "[a]n interlocutory order [on summary judgment] is subject to reconsideration at any time prior to the entry of a final judgment" and citing Rule 54(b) that a "decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.").  Plaintiffs argued pretrial that damages can be determined based on a royalty rate of 7% as set forth in the Sublicense Agreement between the parties and that evidence existed to prove damages and a recovery of

Carolina Farms' profits. [Doc. 183, App. pp. 709-720]. The District Court agreed. [App. pp. 29-34]. As a result, the District Court clarified its decision related to Plaintiffs' PVPA claims as follows:

> While the court's prior ruling granted summary judgment as to Plaintiffs' claims for actual damages based on the royalty rate adjustments calculated by Davis, the statute requires, upon a finding of infringement, that the court award at least a reasonable royalty for the use of the variety by the infringer with interest and costs as fixed by the court. Consistent with this court's prior order excluding the opinion of Plaintiffs' expert, a jury may consider the royalty rate of seven percent (7%) as provided for in the Sublicense Agreement.

> Therefore, Defendants' Motion in Limine seeking exclusion of evidence related to Plaintiffs' infringement and recovery under the PVPA is denied. Plaintiffs will be able to introduce evidence related to a reasonable royalty based on the Sublicense Agreement. Plaintiffs will not be permitted to put forward evidence previously excluded with regard to Davis's royalty adjustment calculations, as that evidence was deemed unreliable.

The District Court also clarified its decision related to Plaintiffs' Lanham Act claims as follows:

> The Lanham Act provides that, upon establishing a trademark or false advertising violation, "the plaintiff shall be entitled . . . subject to the principles of equity, to recover . . . (1) defendant's profits; (2) any damages sustained by the plaintiff, and (3) the costs of the action. 15 U.S.C. § 1117(a). As the statute makes clear, awards under this section are equitable in nature. *Id.* Further, actual damages need not be present for a party to receive an award of defendants' profits; instead an award based on a defendant's profits may be predicated on a theory of unjust enrichment or deterrence. *See Western Diversified Services, Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269, 1272 (10th

Cir. 2005); *Marshak v. Treadwell*, 595 F.3d 478, 495, (3d Cir. 2009).

Furthermore, the Lanham Act allows the court to award attorneys' fees to the prevailing party in exceptional cases. 15 U.S.C. § 1117(a). "An exceptional case is one where the infringement is deliberate, willful, fraudulent, or malicious." *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 885 F. Supp. 141, 144 (M.D.N.C. 1994), *aff'd*, 87 F.3d 654 (4th Cir. 1996) (internal citations omitted).

Plaintiffs' complaint clearly seeks an award based on Carolina Farms' profits as well as costs and attorney's fees. In its Order [Dkt. No. 174] on Carolina Farms' Motion for Summary Judgment, the court found that because there were genuine issues of material fact as to Carolina Farms' liability, granting summary judgment in favor of Carolina Farms as to Plaintiffs' equitable relief was not appropriate. Therefore, Plaintiffs may introduce evidence in support of their claims for equitable relief to include Carolina Farms' profits, Plaintiffs' requested permanent injunction, and Plaintiffs' request for costs and attorney's fees.

For these reasons, Plaintiffs were allowed to present to the jury all evidence in its possession of damages with the exception of Davis' opinion.

At trial, Plaintiffs requested the jury award damages in the amount of $3,228,761.00 under the Lanham Act; $122,166.00 for PVPA violations; and $740,000.00 for its breach of contract claim. [App. pp. 1344-134]. The District Court instructed the jury on the law regarding damages. [App. pp. 1872, 1877, 1878, 1883-1885]. The verdict form allowed the jury to enter an amount of "damages." [App. pp. 3-5]. Despite Plaintiffs' request and the verdict form, the jury chose to award Plaintiffs no damages on any of its

claims against Carolina Farms. Thus, the District Court did not err in any interlocutory order related to damages, and given the fact the jury was allowed to decide the question of damages, Plaintiffs' argument that the District Court's orders were erroneous is without merit.

## 4. The District Court Properly Denied Plaintiffs' Motion for Directed Verdict.

The District Court properly denied Plaintiffs' Motion for Directed Verdict on their PVPA and Lanham Act claims. Denial of a motion for directed verdict is subject to *de novo* review. *See U.S. v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005). The evidence must be considered in the light most favorable to the non-moving party, and "[i]f reasonable minds could differ about the result in this case," the jury's verdict must stand." *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543 (4th Cir. 2003). Substantial evidence is more than a mere scintilla, but may be less than a preponderance, and means such evidence as a reasonable mind might find adequate to support a conclusion. *Brown v. Apfel*, 11 Fed. Appx. 58, 59 (4th Cir. 2001).

### A. The District Court Properly Denied Directed Verdict on Plaintiffs' PVPA claim.

The evidence was conflicting as to whether Carolina Farms violated the PVPA. Plaintiffs argued at directed verdict that Carolina Farms violated the PVPA by allegedly failing to put a "[PVPA] notice on [Carolina Farms']

invoicing or [Carolina Farms'] paperwork" about unauthorized propagation. [App. pp. 1773-1774]. The District Court properly found this allegation was insufficient to grant a direct verdict in Plaintiffs' favor.

First, this allegation is not pled in Plaintiffs' Complaint. [Doc. 1]. Second, the PVPA does not specify how, or in what manner, notice is to be given upon dispensing a protected variety or that unauthorized propagation is prohibited. The PVPA does not require the use of certain language or mandate where any language related to a protective variety must be displayed. Third, this allegation is more properly categorized as a breach of contract claim because the PVPA defers to the parties' agreement regarding any conditions or limitations to be placed on the protected variety at issue. [App. pp. 1704-1709, 1661-1666, 1897-1898 ¶ 8.2]. Specifically, the PVPA provides that "the owner of a protected variety may authorize the use of the variety under this section subject to conditions and limitations specified by the owner." *See* 7 U.S.C. § 2541(b).

Based on the evidence presented at trial, Plaintiffs never enforced paragraph 8.2 of the Sublicense Agreement concerning the placement notices regarding unauthorized propagation. The evidence was replete that Plaintiffs never enforced that provision against Carolina Farms when it was a sublicensee, or against any other sublicensees. [App. pp. 1100-1116, 1424,

1704-1709].   Because this allegation relates to the contract, the evidence supported Carolina Farms' contract-related defenses such as the implied duty of good faith and fair dealing, modification of contract, waiver, unclean hands, and estoppel.  [App. pp. 1879-1883].

Finally, the PVPA provides, "No recovery shall be had for that part of any infringement committed more than six years (*or known to the owner more than one year*) prior to the filing of the complaint or counterclaim for infringement in the action."  *See* 7 U.S.C. § 3566 (emphasis added).  The PVPA expressly disallows an owner—here, the Plaintiffs—to exercise the owner's rights under the PVPA if the owner waits more than one year after knowledge of a violation.  The evidence suggested that any alleged failure to place an unauthorized propagation notice on certain documentation occurred more than six years before filing the complaint.  At the very least, the failure to place this notice on behalf of any of their sublicensees was known to Plaintiffs more than one year after it occurred because Plaintiffs allowed this practice for many years with all their sublicensees.  [App. pp. 1704-1709].  As a result, the District Court properly denied Plaintiff's motion for directed verdict on this ground.

**B.    The District Court Properly Denied Directed Verdict on Plaintiffs' Lanham Act claim.**

Similarly, the District Court properly found factual issues remained for a jury on Plaintiffs' Lanham Act claims.  To recover on a Lanham Act claim for "reverse passing off"—that is, attempting to sell Plaintiffs' grass under its own name—Plaintiffs must prove each of the following elements:

> (1) that the work at issue originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin.

*Lipton v. Nature Co.*, 71 F.3d 464, 473 (2d Cir. 1995).  The task of weighing these factors is traditionally reserved for a fact finder.  *See Tools USA & Equip. Co. v. Champ Frame Straightening Equip.*, 87 F.3d 654, 661 (4th Cir. N.C. 1996).

As to the threshold factor, a significant factual dispute existed at trial as to whether the grass that Carolina Farms sold "originated with the Plaintiff" and was falsely designated.  Throughout trial, Carolina Farms presented overwhelming, if not uncontroverted, evidence that the fields were destroyed.  [App. pp. 906-907, 1534, 1536-1539, 1542-1546, 1558, 1723-1724].

A factual issue also existed as to customer confusion.  The determination of customer confusion is a factual determination of (1) the

strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public. *George & Co., LLC, v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009). The "focus [is] on whether there exists a similarity in sight, sound, and meaning which would result in confusion." *Id.* at 396.

The evidence does not support a conclusion that "Carolina Green" sounds like, looks like, or has the same meaning as *TifBlair* and was likely to cause customer confusion. [App. pp. 738, 764-765, 774-775, 876, 1157-1160]. Plaintiffs even admit that these two brands lack any similarity in sight, sound, or meaning. [Id.]. Moreover, Plaintiffs presented no evidence of actual confusion, and no market or customer survey evidence was presented. [App. pp. 776-778, 1164-1165]. *See George & Co., LLC*, 575 F.3d at 398 ("Actual confusion can be demonstrated by both anecdotal and survey evidence.") Carolina Farms presented evidence to show a factual dispute existed as to whether the presence of "Carolina Green" created a

probable likelihood of confusion in the mind of potential customers. *See Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663-64 (5th Cir. 2000).

Finally, factual questions existed regarding whether Plaintiffs suffered any proximate harm from any alleged infringement. [App. pp. 1720-1721, 1780-1781, 1860]. In light of the disputed evidence on every element, the District Court properly denied Plaintiffs' motion for directed verdict on their Lanham Act claims, and the jury properly found that Carolina Farms' actions did not violate the Lanham Act.

### 5. The District Court Did Not Limit the Jury's Consideration of a Reasonable Royalty Rate.

Plaintiffs assert the District Court erred in limiting the jury's consideration of a royalty rate. This argument is without merit.

First, pursuant to the language of the PVPA, a reasonable royalty rate is only applicable after there is a finding of infringement. The PVPA states, "***upon finding an infringement***, the court shall award damages adequate to compensate for the infringement, but in no event less than a ***reasonable royalty*** for the use made by the variety of the infringer." 7 U.S.C. § 2564 (emphasis added). In this case, the jury did not find infringement, so any evidentiary determination as to a reasonable royalty rate is not a sustaining issue on appeal.

Second, the District Court did not limit the jury's consideration of a reasonable royalty rate. Rather, the District Court only excluded erroneous opinion testimony of Mr. Davis as to his royalty calculation. The District Court never instructed the jury as to the amount of the royalty rate to consider. The District Court's jury instruction related to PVPA damages was based on a reasonable royalty:

> The measure of Plaintiffs' damages under the Plant Variety Protection Act is the amount of damages adequate to compensate Plaintiffs for the infringement but in no event less than a reasonable royalty for the use made of the variety by Defendants.

[App. p. 1872]. Not only was this charge requested by Plaintiffs, it is entirely consistent with the language of the PVPA. *See* 7 U.S.C. § 2564. Further, after the Court charged the jury on this aspect of damages, Plaintiffs did not object to the charge. Plaintiffs also did not object to the District Court's pretrial determination that the jury "*may*" consider the royalty rate as set forth in the Sublicense Agreement. [App. p. 31]. In fact, the Plaintiffs argued the royalty rate could be based on the Sublicense Agreement. [App. p. 711]. Because the District Court's charge on damages under the PVPA did not limit the jury on how to determine a reasonable royalty rate, Plaintiffs' argument must fail.

However, assuming arguendo the jury should have considered a royalty rate, the PVPA contemplates the use of a *reasonable* royalty rate. Plaintiffs failed to present any competent, admissible evidence to the District Court that the reasonable royalty rate should have exceeded seven percent (7%). The Sublicense Agreement stated, "Sublicensee agrees to pay a royalty on all sales of Sublicensed Product of seven (7) percent of the sales amount, net of delivery costs and sales taxes if applicable." [App. p. 1896]. The Turfgrass Group then changed the royalty rate to range between seven percent (7%) and four percent (4%) based on sales volume. [App. pp. 1030-1031, 1150-1154, 1715, 2036-2037]. Carolina Farms' royalty reports listed the payment of a five percent (5%) royalty rate. [App. pp. 1943-1965]. Carolina Farms' competitor, SuperSod, had an agreement with Plaintiffs that called for a five percent (5%) royalty rate. [App. p. 2031]. Plaintiffs admitted that a royalty rate of 5% was "reasonable." [App. p. 1154]. Plaintiffs failed to offer the District Court any competent evidence of a royalty rate that exceeded 7%; therefore, the District Court did not err when it charged the jury on PVPA damages.

**6. The District Court Properly Refused to Instruct the Jury on the Merger Clause.**

Plaintiffs appeal the District Court's refusal to instruct the jury regarding the merger clause contained in the parties' Sublicense Agreement.

Plaintiffs assert the District Court's denial of their request was improper because there was no ambiguity in the contract; therefore, the court should have instructed the jury not to consider parol evidence presented during trial.

Plaintiffs cannot now raise this issue on appeal. Throughout the course of trial, parol evidence testimony was elicited from witnesses, but Plaintiffs never once objected on this basis. [App. pp. 1223-1231, 1658-1661]. Moreover, Plaintiffs' own exhibits contained parol evidence. [App. p. 2012-2013, 2064-2054]. If Plaintiffs believed the jury should not have considered parol evidence, Plaintiffs had an obligation to timely object. Plaintiffs' failure to object to any parol evidence precludes consideration of this issue on appeal.

Moreover, the District Court properly denied Plaintiffs' request to instruct the jury on the merger clause of the Sublicense Agreement based on evidence of ambiguity related to the intention of the parties. *See Doyle v. Estes Heating & Air Conditioning, Inc.*, 326 S.E.2d 846, 848 (Ga. Ct. App. 1985) (finding parol evidence is admissible for any latent or patent ambiguity). In this case, Plaintiffs sought to obtain royalties on uncertified fields. At the very least, the Sublicense Agreement was ambiguous as to whether Carolina Farms was required to pay the Turfgrass Group a royalty on uncertified grass. The Turfgrass Group terminated the Sublicense

Agreement for cause based on an alleged failure to maintain the TifBlair fields consistent with certification and production protocol. [App. pp. 550, 641-642]. The Turfgrass Group relied on Article 12.1(c) "failure of Sublicensee to maintain production fields consistent with certification and production protocol" as the cause of the termination. [App. pp. 490-491]. Based on this, paragraph 12.3 of the Agreement provides:

> In the event this Agreement is terminated for reason 12.1(c) [failure to keep fields certified], Sublicensee may sell existing inventory only into the generic trade as variety not stated and all Sublicensed Product material must be destroyed and verified by Sublicensor within one year of termination.

[App. pp. 672, 1893-1902].

The Sublicense Agreement does not require payment of royalties on uncertified grass because the definition of "Sublicensed Product" requires the grass to be grown from a certified field. [*See* App. p. 1893 ¶ 1.1 "'Sublicensed Product' means 'certified sod;'" ¶ 1.3 "'Sublicensed Sod' means sod production from Certified Seed under cultivation conditions which meet the specifications of the official crop certifying agency of the state in which said sod was grown;" ¶ 5.3 "Sublicensee agrees to pay a royalty on all sales of Sublicensed Product of seven (7) percent of the sales amount"]. In fact, the District Court had already ruled the contract was ambiguous with regard to the payment of royalties. In denying Plaintiffs'

motion for summary judgment on Plaintiffs' breach of contract claim, the Court stated, "[T]he court finds that there *is an ambiguity in the language of the agreement as to the requirement for the payment of royalties*." [App. p. 12] (emphasis added).

Further, the Court noted that a jury charge on the merger clause was not proper because evidence existed in the record that the Sublicense Agreement was modified through the course of conduct and regular business practices of the parties, so the provisions of the Sublicense Agreement were waived. Without objection, the District Court properly instructed the jury on waiver, modification of contract, and ambiguity. [App. pp. 1879-1882]. A charge based on the merger clause would be inconsistent with the law regarding these defenses.

Finally, the District Court would have improperly invaded the role of the fact finder if it instructed the jury on the effect or meaning of a particular clause in the Sublicense Agreement. The Court explained that Plaintiffs were allowed to argue at closing argument the express language of the merger clause, but the District Court was not going to instruct the jury on a specific clause in the Agreement. [App. pp. 1817-1818]. As such, the jury was properly instructed that "contracts are generally examined in and interpreted as a whole." [App. p. 1881]. The jury had the opportunity to

read and consider the plain language of the agreement. Plaintiffs never mentioned or made reference to the "merger clause" during closing arguments, which indicates the lack of importance of this clause based on the facts of this case. [App. p. 1821].

As such, the District Court's refusal to charge the jury on the merger clause was proper.

## CONCLUSION

For all of the foregoing reasons, the District Court should be affirmed.

/s/ Robert F. Goings
Robert F. Goings
Goings Law Firm, LLC
Post Office Box 436
Columbia, South Carolina 29202
Telephone: (803) 350-9230

Christian Boesl
Collins and Lacy, P.C.
1330 Lady Street, 6th Floor
Columbia, SC 29202
Telephone: (803) 256-2660

*Attorney for Appellees*

Columbia, South Carolina

June 3, 2013

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 3rd day of June, 2014, I caused this Brief of Appellees to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Cecil D. Nolan
411 South Main
Post Office Box 68
Stuttgart, Arizona  72160
(870) 673-3200

*Counsel for Appellants*

Damon C. Wlodarczyk
RILEY POPE & LANEY, LLC
Post Office Box 11412
Columbia, South Carolina  29211
(803) 799-9993

*Counsel for Appellants*

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the Brief of Appellees will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

/s/ Robert F. Goings
Robert F. Goings

*Counsel for Appellees*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*9,707*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>June 3, 2014</u>                  <u>/s/ Robert F. Goings</u>
                                        Robert F. Goings

                                        *Counsel for Appellees*